Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2176 | **DATE** | 10/19/2004 |
| **CASE TITLE** | JOHNSON, et al. vs. CHICAGO PLASTERING INSTITUTE HEALTH AND WELFARE FUND, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motion for summary judgment [13-1] is granted. The court declares defendants are primarily liable and plaintiffs are secondarily liable for the shared participants' claims during the overlapping period. Defendants' motion for summary judgment [15-1] is denied. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | **OCT 20 2004** | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | **33** |
| | Mail AO 450 form. | | 10/19/2004 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| CB | courtroom deputy's initials | | PW mailing deputy initials | | |

U.S. DISTRICT CT

2004 OCT 20 PM 12:59

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFF JOHNSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 04 C 2176 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| CHICAGO PLASTERING INSTITUTE | ) | |
| HEALTH AND WELFARE FUND, et al., | ) | **DOCKETED** |
| | ) | |
| Defendants. | ) | OCT 2 0 2004 |

## MEMORANDUM OPINION AND ORDER

This case involves a group of employees ("the participants") who received health coverage from the Chicago Plastering Institute Health and Welfare Fund ("Plasterers fund" or "Plasterers plan"). After a vote to switch bargaining representatives, the participants obtained coverage from the Masons Health and Welfare Fund, Local 56 of DuPage County ("Masons fund" or "Masons plan") while maintaining coverage under the Plasterers plan. Each plan's coordination of benefits provision provides it is secondary to the other. The funds dispute which fund is primarily liable for payment of the participants' health care claims from the period of overlapping coverage. Jeff Johnson, *et al.*, ("plaintiffs"), as trustees and fiduciaries of the Masons fund, sue Richard Dahm, *et al.*, ("defendants"), trustees and fiduciaries of the Plasterers fund, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3); *see also Winstead v. J.C. Penney Co., Inc. Voluntary Employees Beneficiary Assoc.*, 933 F.2d 576, 578-80 (7th Cir. 1991) (ERISA fund may sue another fund to enforce its plan provisions). Plaintiffs seek to enforce the Masons plan's coordination of benefit provision. Cross-summary judgment motions are before the court.

1

33

## BACKGROUND

The material facts are undisputed. The Masons and Plasterers plans are self-insured welfare benefit plans under ERISA, 29 U.S.C. § 1002(1). Masons Facts at ¶¶ 2-3, 7-8. The Plasterers fund is a third-party beneficiary of a collective bargaining agreement between the Journeymen Plasterers Protective and Benevolent Society of Chicago, Local No. 5 ("Local 5") and signatory employees. Plasterers Facts at ¶ 9. The Plasterers fund provides health benefits to eligible plaster employees and their beneficiaries; once employees become eligible, the coverage year runs from April 1st through March 31st of the year of eligibility. *Id.* at ¶¶ 11-13. An employee becomes eligible for coverage by the plan if 1200 contribution hours are reached in a given year. *Id.* at ¶ 13. The Masons fund similarly provides health benefits to eligible plasterers and their beneficiaries pursuant to collective bargaining agreements between Local 56 of the International Union of Bricklayers and Allied Craftworkers ("BAC 56") and various employers. *Id.* at ¶ 15. Many plastering employers were signatories to both the Local 5 and BAC 56 collective bargaining agreements. *Id.* at ¶ 16.

In 2001, BAC 56 began an organizing campaign to become the exclusive bargaining representative of plastering employees in the Chicagoland area. *Id.* at ¶ 17. BAC 56 worked to convince plastering employees of dual-signatory employers to vote for BAC 56 and against Local 5 in National Labor Relations Board elections. *Id.* In any election BAC 56 won, the employer no longer had an obligation to contribute to the Plasterers fund pursuant to the Local 5 agreement. *Id.* at ¶ 18. The Masons fund sought to expand its number of participants and supported BAC 56's campaign. *Id.* at ¶¶ 20, 26. BAC 56's campaign was successful and in 2002 some employees voted to certify BAC 56 as their exclusive collective bargaining representative. *Id.* at ¶ 36. In addition, some employees opted to switch from the Plasterers fund to the Masons fund and all employer

contributions on their behalf went to the Masons. *Id.* at ¶ 37. Specifically, seven participants and

their beneficiaries obtained coverage under the Masons plan between April and August 2003.

Masons Facts at ¶¶ 58-60. The coverage lasted through March 31, 2004 or later. *Id.* at ¶ 61.

Pursuant to the eligibility provision of the Plasterers plan, the participants also remained covered by

the Plasterers through March 31, 2004. *Id.* at ¶¶ 59, 63; Plasterers Facts at ¶ 39.

## A. The Plasterers Plan

Faced with the loss of participants due to the BAC 56 campaign, and the resulting loss of

their contributions, in 2002 the Plasterers plan was amended to read:

> Notwithstanding any other provision of the plan, effective February 1, 2002, if an
> Employee covered by the plan is covered by any other group health plan as a result
> of work he or she performed pursuant to a collective bargaining agreement, this plan
> will only provide secondary coverage for such Employee and any eligible
> Dependents. The other group health plan will be the primary coverage.

*Id.* at ¶ 40. The amended language represents the Plasterers plan's terms governing coordination of

benefits and applies only when an employee's coverage by another plan begins subsequent to the

commencement of the employee's coverage by the Plasterers plan. Masons Facts at ¶¶ 22-23. The

purpose of the coordination of benefits provision is to save money for the Plasterers fund. *Id.* at ¶

27.

## B. The Masons Plan

The Masons plan states:

> Effective December 1, 1991, The Plan has been designed to be a secondary payer to
> all other health coverage. . . If an employee or dependent is covered by another self-
> insured medical plan which provides that it is secondary to all other policies, then
> this Plan will pay only 50% of the covered expenses that otherwise will be payable
> under this Plan.

*Id.* at ¶ 14. The following amendment was approved:

3

If an employee or dependent is covered by another medical plan which provides that it is secondary to all other policies, then this Plan, in compliance with applicable law governing cases where both plans claim secondary status, without waiving its secondary status, will pay only 50% of the covered expenses that otherwise will be payable under this Plan. The Trustees further clarify that since January 1, 1991, these coordination of benefit rules provide that this plan is secondary if an employee or dependent is covered by another medical plan that provides that it is secondary to all plans of the type of this Plan, such as any plan that provides that it is secondary for an employee or dependent who is covered by any other group health plan as a result of work an employee performs pursuant to a collective bargaining agreement. Again, in compliance with applicable law governing cases where both plans claim secondary status, this Plan, without waiving its secondary status, will also pay only 50% of covered expenses otherwise payable under this Plan.

*Id.* at ¶ 15. The January 1, 1991 date in the amendment was an error; the correct date was December 1, 1991. *Id.* at ¶ 16. The purpose of the coordination of benefits provision is to limit the Masons fund's costs of providing health care benefits to participants and beneficiaries. *Id.* at ¶ 17.

## C. Coordination of Benefits

In 2003, the funds communicated about coordinating benefits for the shared participants. Plasterers Facts at ¶ 42. Based on its plan, the Masons fund asserted the Plasterers plan should provide primary coverage for the participants. *Id.* Likewise, the Plasterers fund, based on the February 2002 amendment to its plan, asserted the Masons plan should provide primary coverage. *Id.* at ¶ 43. Specifically, on June 25, 2003, Masons sent Plasterers a letter enclosing copies of: (1) the Masons plan's coordination of benefit provisions; and (2) the Plasterers plan's pre-2002 amendment coordination of benefits provisions. Masons Facts at ¶ 42. The letter noted Masons appeared to be secondary and the Plasterers primary for persons covered under both plans. *Id.* On July 1, 2003, the Masons faxed Plasterers the Masons Fund Summary Plan Description ("SPD") section dealing with coordination of benefits. Plasterers Facts at ¶ 44. In response, Plasterers requested a copy of the complete SPD. *Id.* at ¶ 45. The request was denied. *Id.* On September 15,

2003, Masons again faxed Plasterers and explained the Masons plan only pays 50% when a participant is also insured under another plan. Masons Facts at ¶ 45. The facsimile attached a letter from a Masons plan attorney, that stated: "[o]ur plan provides that it is secondary to all other health coverage. However, from time to time, we run into situations where another health care plan claims to be secondary to our plan. In that situation . . . our plan would pay 50% of the benefits it would otherwise pay, and then the member can go to the other plan for the other 50% of the benefits." *Id.* at ¶ 46.

On September 23, 2003, Plasterers sent Masons a letter that stated: "[w]e are notifying all [dually covered participants] that any medical expense they incur as of the date they are covered with you should be sent first to your local, then to us." *Id.* at ¶ 47. Accordingly, between September 22nd and September 26th, 2003, Plasterers sent letters to the participants entitled "Denial of Primary Coverage." *Id.* at ¶¶ 69-72. The letters explained the Masons plan was primary and the Plasterers plan secondary for all claims incurred by the participants and beneficiaries on or after their Masons Plan effective date. *Id.*

**D.  Payment of Claims**

In the fall of 2003, Masons directed Blue Cross and Blue Shield of Illinois, a third-party administrator, to pay claims as though the Masons fund provided primary coverage, but at 50% of the usual plan benefit. Plasterers Facts at ¶ 58. In contrast, on September 22, 2003, Plasterers advised several medical providers the Plasterers plan was secondary on claims for the shared participants and claims should first be submitted to the Masons fund. *Id.* at ¶ 60. In addition, on September 26, 2003, Plasterers advised some of the shared participants their claims had been denied on a primary basis. *Id.* at ¶ 61.

5

In early 2004, Plasterers again requested a complete copy of the Masons SPD. *Id.* at ¶¶ 46, 65. Masons refused the request. *Id.* Shared participants began contacting Plasterers to inquire about the Masons fund's 50% payments. *Id.* at ¶ 66. On March 3, 2004, Plasterers responded to two participants as follows:

> We have been faxed an Explanation of Benefits (EOB) for your dental claims from the [Masons fund]. Since you are a member of the [Masons fund] and also choose to be an employee of a [Masons fund] signatory company, the [Masons fund] is your primary benefit carrier. The [Plasterers fund] became your secondary carrier the day you became eligible at the [Masons fund].
>
> As your primary carrier, the [Masons fund] should pay your claims as if there were no other benefit carriers involved. This is known as Coordination of Benefits. Paying half of your benefit is not Coordination of Benefits (COB). Just because they have written that on your EOB does not make it a COB.
>
> I have personally called the [Masons fund] Administrator on your behalf to try and get you fair treatment with this matter. Their reply was to threaten a lawsuit against us. If you were promised benefits and have them in writing or even verbally, we may be able to use that to get your claim paid by the [Masons fund]. It's crucial that we all find out when the [Masons fund] plans to pay the other half of the benefit they promised you. <u>You have to follow their appeal process outlined in the Summary Plan Description (SPD) that they were required to send you.</u> You need to initiate this process as quickly as possible. You should not allow them to disregard you; you need to stay on them to keep the pressure up until you are treated fairly.
>
> The [Plasterers fund] will gladly pay secondary benefits according to COB. We need to know the plan you are under with the [Masons fund] . . . Please understand that we cannot make up the difference between what the [Masons fund] should have paid under COB and what we are obligated to pay as secondary.
>
> I am really sorry that the [Masons fund] is stonewalling us on getting your claims paid properly. We here at the [Plasterers fund] will help you any way we can.

Masons Facts at ¶ 83 (underline in original). Similarly, in May 2004, Plasterers responded to a bill from a participant's dentist by indicating that as a secondary carrier, it would not pick up coverage until the primary plan paid the claim as if no other carriers were involved. *Id.* at ¶¶ 85-86.

In February 2004, counsel for the parties exchanged communications regarding the coordination of benefits for shared participants. Plasterers Facts at ¶¶ 69-77. On March 24, 2004, the Masons fund trustees filed this lawsuit. *Id.* at ¶ 79. Because the Plasterers fund was not paying any benefits after the Masons fund paid benefits on a 50% basis, the Masons fund began paying the participants' claims in the amount of the full plan benefit available, subject to subrogation and reimbursement agreements. Masons Facts at ¶ 88, 104. The agreements provided the Masons fund would pay 100% of the benefits payable under its plan, but maintained a right to any payment that might be ordered from the Plasterers fund as a result of litigation. *Id.* at ¶¶ 88, 104-109. Accordingly, on April 1, 2004, Masons authorized Blue Cross Blue Shield to pay medical claims in the amount of 100% of the benefit payable under the Masons plan. *Id.* at ¶¶ 110-111; Plasterers Facts at ¶ 80. In addition, Masons paid dental, vision and hearing benefits through its fund office at 100% of the plan benefit. Masons Facts at ¶ 112.

## DISCUSSION

### I.     Summary Judgment Standards

On cross-motions for summary judgment, each movant must satisfy the requirements of Fed. R. Civ. P. 56. *EEOC v. Admiral Maint. Serv., L.P.*, No. 97 C 2034, 1998 WL 102748, at * 6 (N.D. Ill. Feb. 26, 1998). Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable

inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## II.    Summary Judgment Motions

Masons argues the two coordination of benefits provisions do not necessarily conflict. However, if the court does find a conflict, Masons seeks a declaration that the parties' coordination of benefits provisions require each to pay as primary, on a *pro-rata* basis, one-half of the eligible benefit under their plan for the shared participants. Masons relies on *Winstead v. Indiana Ins. Co.*, 855 F.2d 430, 433-34 (7th Cir. 1988) for the *pro-rata* resolution. In the alternative, Masons seeks a declaration from the court ordering any distribution of payment between the parties deemed appropriate, and a declaration and injunction requiring "any transfers between the Masons plan and Plasterers plan necessary to ensure that benefits have been paid in accordance with the relevant plan provisions." Pl. Mem. at 14. Masons further asserts it is critical that, in fashioning the declaratory and injunctive relief, the court: (1) order neither party may utilize its plan provisions as a subterfuge to refuse benefits; (2) order any discounts which may apply should be appropriately apportioned in light of the Masons plan's advancement of the full amount of benefits payable; and (3) issue judgment that enforces compliance with its terms through potential contempt sanctions.

Plasterers argues: (1) the Masons plan provision does not apply to the Plasterers plan provision; (2) if it does apply, the plans' provisions conflict; (3) Masons reliance on *Winstead* is erroneous because *Winstead* did not involve two ERISA plans with conflicting coordination of benefits provisions; and (4) the only federal appellate decision involving a similar conflict between

two ERISA plans adopted the priority rule promulgated by the National Association of Insurance Commissioners ("NAIC") and held the plan of the patient's employer must be primary. *McGurl v. Trucking Employees of North Jersey Welfare Fund*, 124 F.3d 471 (3rd Cir. 1997). Plasterers urges the court to follow the NAIC principles as adopted by the *McGurl* decision, the health insurance community and the majority of self-funded plans, and seeks a declaration that the Masons plan is primary and Plasterers plan secondary. Finally, Plasterers argues injunctive relief is legally and factually unwarranted and, if issued, would require disposition of numerous factual issues.

### A.    Conflicting Provisions

Masons argues this case may be easily resolved because the plans' terms do not necessarily conflict. While both plans contain provisions asserting secondary status, only the Masons plan provides a provision delineating a procedure for claim payments when two plans both claim secondary status. Masons interprets the 50% payment provision triggered by the Plasterers provision. Masons proposes the plans may be reconciled if the Masons plan acts as the primary carrier by paying benefits first at a 50% level. Plasterers may then apply its plan terms to the remaining unpaid benefit while enjoying secondary status.

Plasterers argues Masons fails to provide any support for its interpretation that the Masons plan's 50% provision is triggered by the Plasterers plan's secondary payment provision. Rather, Masons simply expects the court to defer to its interpretation. Plasterers argues that interpretation is erroneous based on the language of the documents. Specifically, the Masons plan provides the 50% rule applies when another plan claims to be secondary "to all other policies." In contrast, the Plasterers plan claims to be secondary, not to all other policies, but only to policies under which an employee gained coverage as a result of work performed pursuant to a collective bargaining

agreement. Plasterers concludes the Masons plan's 50% provision does not apply but, if it does, the plans are irreconcilable.

The parties' feeble attempts to argue the plan provisions do not conflict must fail. First, the court finds no meaningful distinction between the 50% provision applying to provisions secondary to all other policies versus those secondary on account of work performed pursuant to a collective bargaining policy. Plasterers merely argues the plans' secondary provisions do not match exactly, without offering any explanation as to why the distinction in language matters. Clearly, in practice the broader language of the Masons plan provision encompasses the narrower scope of the Plasterers provision. In any event, both plans claim to be secondary to another plan covering the employees at issue. Masons also correctly points out that, setting aside the 50% provision, the plan still maintains an "always secondary" clause. Therefore, if the court finds the Masons plan's 50% provision does not apply to the Plasterers plan provision, the plan terms still conflict and the court must proceed anyway. In other words, the inquiry does not end regardless of whether the court finds the Masons plan provision covers the Plasterers plan provision.

Second, Masons position regarding resolution of this case is the same whether the court accepts the plan terms outright or analyzes the appropriateness of the 50% *pro-rata* proposal as if the parties' terms conflict. Both require the court's consideration of whether Masons proposed *pro-rata* method of reconciling the plans' provisions is lawful or even feasible. The court declines to adopt the Masons plan terms outright without first analyzing their appropriateness.

## B.     Coordination of Benefits

Masons argues *stare decisis* requires the court to follow *Winstead* and hold both parties are primarily and equally liable to pay the claims on a *pro-rata* basis. In *Winstead*, plaintiffs-appellants

were trustees of a self-insured ERISA fund. *Winstead*, 855 F.2d at 431-32. Defendant-appellee was

an insurance company authorized to sell insurance in Michigan. *Id.* at 432. Each party's insurance

policy contained a coordination of benefits clause that purported to impose primary liability on the

other for injuries arising out of automobile accidents. *Id.* An individual, insured by both policies,

was injured in an automobile accident. *Id.* The ERISA fund paid all of the individual's medical

costs and filed an action to have the insurance company declared primarily liable for those costs.

*Id.* The district court found the two coordination of benefits clauses mutually repugnant, voided

them both and held the fund and insurance company liable *pro-rata* for the payment of benefits. *Id.*

at 433. The Seventh Circuit affirmed:

> Having excluded the possibility that ERISA preemption causes the Fund's
> coordination of benefits provision to supersede the Indiana Insurance policy, the
> district court turned to federal common law to determine which insurer qualified as
> Crampton's primary coverage provider. The court's analysis followed the approach
> taken by the Third Circuit in the only other case in which a federal court arguably
> reached the issue of apportioning liability between an ERISA policy and a non-
> ERISA policy containing incompatible "other insurance" provisions. In *Northeast
> Dept. ILGWU v. Teamsters Local 229*, 764 F.2d 147 (3d Cir. 1985), the Third Circuit
> was presented with two different types of conflicting "other insurance" clauses, one
> of which the court held unenforceable as a matter of law. Thus, *Northeast Dept.
> ILGWU* never actually addressed the issue of how to choose between two truly
> conflicting and equally viable "other insurance" clauses. A footnote to the decision,
> however, indicates that "other courts faced with incompatible 'other insurance'
> clauses have frequently declared the clauses to be 'mutually repugnant' and have held
> both insurers primarily liable for the insured's loss on a pro-rata basis. *See* 8A
> Appleman, Insurance Law and Practice § 4910, at 477." *Northeast Dept. ILGWU*,
> 764 F.2d at 161 n.13. *See also* 16 Couch on Insurance §§ 62:79-62:81 (2d ed.).
> Application by the district court in this case of such a solomonic apportionment of
> liability is not only in keeping with generally accepted notions derived from state
> common law, *see* Appleman and Couch, *supra*, but seems eminently fair and
> equitable.

*Id.* at 434 (7th Cir. 1988). The remainder of the *Winstead* opinion focused on preemption and waiver

issues. *See id.* at 433-35.

Plasterers argues Masons reliance on *Winstead* is erroneous and urges the court to follow *McGurl v. Trucking Employees of North Jersey Welfare Fund*, 124 F.3d 471 (3rd Cir. 1997). In *McGurl*, two self-funded welfare benefit plans contained coordination of benefits clauses that restricted liability if participants were covered by both plans. *Id.* at 473-75. Some participants, who were covered as employees by one plan and as dependents by the other, presented claims and both plans claimed to be secondary providers of coverage. *Id.* Appellant-ERISA plan paid the shared participants' claims and sued appellee-ERISA plan seeking: (1) a declaration that appellee was primarily liable for employee health care claims that appellant had paid; and (2) reimbursement for the paid claims. *Id.* at 475 The district court granted appellee's summary judgment motion and held primary coverage should be provided by the plan that covered claimants as employees rather than as dependents. *Id.* at 475-76.

The Third Circuit affirmed. In rejecting appellant's proposed *pro-rata* rule, the court indicated the only two appellate courts to have considered the application of the *pro-rata* rule were not presented with plans that were both regulated by ERISA. *Id.* at 484, *citing Winstead*, 855 F.2d at 432; *Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.*, 31 F.3d 371 (6th Cir. 1994). The court noted that when two ERISA medical plans are involved:

> [I]t is unclear how the [*pro-rata*] rule would operate in practice. Although a *pro-rata* rule may technically encompass proportional payment rather than 50-50 payment . . . the Funds were unable to explain precisely how proportional payment would be fixed. Benefit plans are unlike casualty insurance, which is the field in which *pro-rata* payments primarily operate. There has been no satisfactory explanation of its feasibility in the medical benefits field, where different plans have different deductibles and coverages. . . It may be that it was these difficulties that led the vast majority of states to adopt the NAIC recommended "employer-first" rule.

*Id.* at 485. In contrast, the court noted, most states have not adopted the *pro-rata* rule for non-ERISA state health benefit plans. *Id.* at 484.

*McGurl* emphasized the importance of promoting uniformity and predictability in the application of ERISA plans and sought to avoid a disposition that would encourage and reward plans with "always secondary" provisions. *Id.* at 483-86. Adopting the *pro-rata* rule, *McGurl* stressed, would improperly reward always secondary provisions. *Id.* In an ever-increasing environment of participant coverage by multiple plans, all plans would have an incentive to adopt the always secondary and *pro-rata* approach to avoid ever paying more than 50% on any claim. *Id.* This would produce a "race to the bottom" for claim reimbursement, an increased likelihood of litigation, and a chaotic atmosphere that jeopardizes the predictability and certainty for plan sponsors and beneficiaries that is central to ERISA. *Id.* at 485. Therefore, *McGurl* affirmed the district court's common law ruling that relied on the Model Regulation promulgated by the NAIC.[1] *Id.* at 484, 486. Accordingly, the plan that covered the person as an employer paid benefits first, and the plan that covered the person as a dependant paid benefits second ("the employer first rule"). *Id.* at 486. *McGurl* noted the only other court of appeals faced with two incompatible ERISA plans also created a federal common law solution and relied on NAIC regulations. *Id.* at 484-85, *citing PM Group Life Ins. v. Western Growers Assur. Trust*, 953 F.2d 543 (9th Cir. 1992) (adopting NAIC "birthday rule").

Unfortunately, "ERISA does not contain a coordination of benefits provision and offers no explicit guidance as to how disputes involving conflicting coordination of benefits clauses are to be resolved. Left with these sorts of legislative 'gaps' that plague ERISA, it has become incumbent

---

[1] The NAIC is an independent group of state insurance regulatory commissioners who, in response to the increasing problem of duplicate coverage, promulgated a set of rules entitled "Group Coordination of Benefits Model Regulation" ("Model Regulation"). *McGurl*, 124 F.3d at 483. The *McGurl* court noted the NAIC recommendations have been widely accepted by courts and state insurance laws. *Id.* The Model Regulation and its legislative history reject the *pro-rata* approach as the preferable method for dealing with order of benefits determination.

upon the federal courts to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *McGurl v. Teamsters Local 560 Trucking Employees of North N.J. Welfare Fund,* 925 F. Supp. 280, 284-85 (D.N.J. 1996), *quoting Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987); *and citing Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147 (3rd Cir. 1985) (recognizing that dispute over coordination of benefits not expressly addressed under ERISA is governed by federal common law); *and PM Group Life,* 953 F.2d 543 (relying on federal common law to resolve issue of conflicting "other insurance" provisions).

The undisputed factual context of this case presents one of first impression. The rules applied in the cited cases do not apply to this situation. In *Winstead,* the Seventh Circuit did not hold that the *pro-rata* approach is automatically appropriate when multiple ERISA plans with secondary provisions conflict. Instead, *Winstead* held the district court's application of the *pro-rata* approach was fair given the facts of the case. As stated in *McGurl,* the *pro-rata* approach is often applied in the automobile casualty insurance context, so the Seventh Circuit's holding was not unique or surprising based on those circumstances. *See McGurl,* 124 F.3d at 485. This case is therefore distinguishable from *Winstead* in a meaningful way because two ERISA covered plans are involved. Nonetheless, Masons argues the only way the court can uphold ERISA's policy permitting self-insured plans to adopt any plan provisions they wish is to follow *Winstead.* By doing so, Masons contends, each plan will be provided cost savings from their secondary coverage provisions without infringing the equally valid cost saving interests of the other plan.

"[O]ne of ERISA's primary purposes is to ensure the integrity of written plans," and "it is inappropriate to fashion a common law rule that would override the express terms of a private plan

unless the overridden plan provision conflicts with statutory provisions or other policies underlying ERISA." *Admin. Comm. of the Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan v. Varco*, 338 F.3d 680, 691-92. However, another one of ERISA's primary goals is the creation of uniformity and predictability in the establishment and execution of employee benefit plans. *McGurl*, 123 F.3d at 483-86. And, as *McGurl* noted, the 50% *pro-rata* rule is not easily applied in a uniform, predictable way in the medical plan context. *Id.* at 485. Even if the court were to fashion a method for applying the 50% rule here, the need for rules that are consistent and predictable is of utmost importance. The court agrees that a disposition that encourages and rewards plans with "always secondary" provisions should be avoided because, as acutely evidenced by the facts of this case, it produces a "race to the bottom" for claim reimbursement, an increased likelihood of litigation, and a chaotic atmosphere. *Id.* at 485-86.

However, the employer first rule adopted by *McGurl* does not apply to this case either. Despite Plasterers attempt to pigeon-hole the facts of this case to make the employer first rule applicable, the participants here, unlike those in *McGurl*, were not dependents under either plan. Rather, they were directly covered employees under two plans that overlapped for a period of time. Plasterers nonetheless argues the court may adopt the employer first rule because the Masons fund coverage is provided as a result of the participants' current employment, whereas the Plasterers fund coverage was continued by virtue of the participants' former employment. This argument must fail because the participants did not obtain new coverage by changing employers. Rather, after voting to certify BAC 56 as their exclusive collective bargaining representative, the participants opted to switch from the Plasterers fund to the Masons fund. All employer contributions on their behalf then went to the Masons fund instead of the Plasterers fund. It is true the Masons plan coverage is based

15

on current contributions by the participants' employers. But the Plasterers plan coverage for the overlapping period was the result of employer contributions as well. Indeed, the participants earned one full year of coverage after reaching 1200 contribution hours in the year. The employer first rule is inapplicable to these facts.

In establishing its order of benefits determination rule, the *McGurl* court relied heavily on the NAIC Model Regulation and its interpretations. *See McGurl* at 483-86. *PM Group Life* also held this approach to be sound and appropriate. 953 F.2d at 546-48. Section 5D of the NAIC Model Regulation, "Order of Benefit Determination," is structured so that Rules 1 through 6 are applied in sequential order until a resolution is reached.[2] Here, Rules 1 through 3 are clearly inapplicable.[3] Rule 4 provides "if a person whose coverage is provided under a right of continuation pursuant to federal or state law also is covered under another plan, the plan covering the person as an employee . . . is primary and the continuation coverage is secondary." The "drafting note" to the rule explains continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1987 and comparable state continuation provisions are the anticipated provisions covered by the rule. Plasterers argues Rule 4 should be loosely interpreted to view its coverage as continuing and therefore secondary. Plasterers seeks to have it both ways. It urges the court to refer to the NAIC Model Regulation, but argues the rules need not be adopted verbatim. Even if adopted liberally, the

---

[2] Plasterers correctly points out the Model Regulation provides that a plan's claims to be "always secondary" will result in the plan being primary. In this case, however, both plans claim to be secondary and neither are consistent with the Model Regulation's traditional primary-first, secondary-second scheme. *See* Section 5A of the NAIC Model Regulation.

[3] Rule 1 represents the employer first rule (applied in *McGurl*). Rule 2 applies to children covered under more than one plan (applied in *PM Group Life*). Rule 3 provides that plans covering active employees are primary over plans covering inactive employees, such as retirees or persons laid off.

coverage provided to the participants during the overlapping period was not continuation coverage. Rather, it was the same as that provided earlier, but the term of coverage had not yet expired. Rule 4 is also inapplicable here.

Rule 5, however, provides if none of the previous rules apply, "the plan that covered the person for the longer period of time is primary." From approximately April 2003 through March 2004, both plans covered the shared participants. However, the participants were covered solely by the Plasterers plan prior to the overlap period. Therefore, the Plasterers plan covered the shared participants and beneficiaries for the longer period of time and is primary pursuant to Rule 5. Because the Model Regulation provides the first rule that determines which plan is primary should be applied, the inquiry ends with Rule 5. The court finds the application of the longer coverage rule is appropriate based on all the circumstances. Unlike the *pro-rata* rule, the longer coverage rule is less susceptible to manipulation. Length of coverage is easily identified by reference to the date coverage became effective and the date coverage terminated. Moreover, the longer coverage rule is simple to administer and furthers the primary ERISA goals of uniformity and predictability.

## C.    Relief

Masons seeks a declaration establishing each party's liability. *Winstead v. J.C. Penney Co., Inc. Voluntary Employees Beneficiary Assoc.*, 933 F.2d 576, 578-80 (7th Cir. 1991) (ERISA fund may seek injunctive or other appropriate equitable relief to enforce its plan provisions). Further, Masons seeks declaratory and injunctive relief requiring "any transfers between the Masons plan and Plasterers plan necessary to ensure that benefits have been paid in accordance with the relevant plan provisions." In order to avoid hardship to the participants while the two funds debated their respective liabilities, the Masons fund paid the participant claims at 100% and reserved the right to

17

reimbursement. The Ninth Circuit not only recognized this approach as desirable, but sanctioned two plans for failing to do so. *PM Group Life*, 953 F.2d at 548-49. Masons further asserts it is critical that, in fashioning the declaratory and injunctive relief, the court adjudge: (1) neither party may utilize its plan provisions as a subterfuge to refuse benefits; (2) any discounts which may apply should be appropriately apportioned in light of the Masons plan's advancement of the full amount of benefits payable; and (3) issue judgment that enforces compliance with its terms through potential contempt sanctions.

Plasterers responds injunctive relief is legally and factually unwarranted because: (1) Masons cannot prevail on its claims; and (2) Masons already paid the claims at 100% and "Defendants stand ready to apply their plan terms to any claims presented for the remaining balance. There is no factual presentation to suggest any basis to order something the Plasterers fund stands ready to do." Def. Resp. at 12-13. Plasterers also suggests the individual claimants must exhaust administrative remedies under its plan before Plasterers may be forced to pay. Plasterers points out mandatory injunctions are rarely issued and the court must look to the conduct of the party seeking equitable relief. Finally, Plasterers maintains questions of fact exist regarding the discounts to be applied and allowable set-offs.

Neither party adequately briefs the remedies issue. Masons readily acknowledges equitable relief is the only remedy available to ERISA fiduciaries. *See Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 763 (7th Cir. 2003). An injunction that seeks the transfer of monies past due under a contract, however, is not available. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-11 (2002). In *Great-West Life*, an ERISA medical plan covered the medical expenses of a participant who was injured in an accident. *Id.* at 207. The ERISA plan's reimbursement

provision gave the plan a right to recover from the participant any payments made by the plan that the participant was entitled to receive from a third party. *Id.* After the participant received a tort settlement, the plan sued in federal court under ERISA Section 502(a)(3) to compel the participant to pay pursuant to the plan's reimbursement provision. *Id.* at 207-08. *Great-West Life* held judicially decreed reimbursement is not "equitable relief" pursuant to § 502(a)(3). *Id.* at 209. The Supreme Court affirmed and held the imposition of liability for a contractual obligation to pay money is legal relief not authorized by § 502(a)(3). *Id.* at 210-11. "An injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity. Those rare cases in which an equity court would decree specific performance of a contract to transfer funds were suits that, unlike the present case, sought to prevent future losses that were either incalculable or would be greater than the sum awarded." *Id.*

This court cannot order a transfer of funds from Plasterers to Masons because that relief is legal, not equitable, and is therefore not authorized by § 502(a)(3). The court is sympathetic to the fact that Masons relied on *PM Group Life* in good faith and to protect participants, in rendering a 100% payout it was not obligated to make. However, *PM Group Life*, perhaps anticipating this problem, noted the way parties should act to protect themselves while also protecting the interests of innocent parties:

> Surely the plans could have devised a means of paying off the debt they collectively owed, and then settled accounts between themselves once the controversy was resolved. . . The plans might each have advanced half of the total sum pending the outcome of the litigation. If they did not trust each other enough to abide by such an informal agreement, they could have set up an escrow account into which each deposited the amount payable under their respective policies. [The hospital] could

have been paid the amount owed to it out of this account, and the winning insurance company would have received the balance once the case was decided.

953 F.2d at 549 and n.8.

Nevertheless, a declaration of Plasterers' primary liability is appropriate. *See McGurl v. Teamsters Local 560 Trucking Employees of North N.J. Welfare Fund,* 925 F. Supp. 280, 284-85 (D.N.J. 1996) (declaring plaintiff primarily liable and defendant secondarily liable for participant claims). The court declares Plasterers is primarily liable for payment of the shared participants claims from the overlapping period of coverage. Plasterers shall act in compliance with this declaration. Because this suit for declaratory action brought by fiduciaries under ERISA § 502(a)(3) is separate and distinct from a suit brought by participants under § 502(a)(1)(B), no exhaustion of remedies by the plan participants is necessary. *See Winstead,* 933 F.2d 576, 578-80. The court presumes Mason will seek reimbursement from the participants through its subrogation agreements once Plasterers complies with this court order.

## CONCLUSION

Plaintiffs' motion for summary judgment is granted. The court declares defendants are primarily liable and plaintiffs are secondarily liable for the shared participants' claims during the overlapping period. Plasterers shall act in compliance with this declaration. Defendants' motion for summary judgment is denied.

October 19, 2004                                    ENTER:

Suzanne B. Conlon

Suzanne B. Conlon
United States District Judge

20